PARRANTO BROTHERS,
INC., Appellant,

v.

CITY OF NEW BRIGHTON, et
al., Respondents.

No. C4–87–2423.

Court of Appeals of Minnesota.

May 24, 1988.

Review Denied July 28, 1988.

William M. Mahlum, Christina Stalker, Mahlum & Associates, St. Paul, for appellant.

John F. Bannigan, Jr., James J. Hanton, Bannigan & Kelly, St. Paul, for respondents.

Thomas L. Grundhoefer, League of Minnesota Cities, St. Paul, amicus curiae League of Minnesota Cities.

Heard, considered and decided by RANDALL, P.J., and PARKER and KALITOWSKI, JJ.

## OPINION

KALITOWSKI, Judge.

Parranto Brothers, Inc. appeals the decision of the district court, which found the City of New Brighton's decision to rezone the subject property was a valid exercise of its legislative power. The court also found that the rezoning did not constitute a taking of appellant's property. We affirm.

### FACTS

In February 1975, appellant Parranto Brothers, Inc. (Parranto) purchased an interest in the subject property. At the time of the purchase, the property was undeveloped and zoned B–3, General Business. The property consisted of 6.3 acres (3.8 acres of dry ground and 2.5 acres of ponds and wetlands) located near the northwest corner of Silver Lake Road and County Road E in the City of New Brighton.

By April 1975, the New Brighton Board of Planning had determined the subject property was zoned inappropriately for the area and should be designated for a less intensive use. This determination was made in the course of preparing the city's Comprehensive Land Use Plan. Parranto was aware of the board's determination.

In July 1975, Parranto filed a landscape and plat plan with the city for the proposed development of the property. It proposed to clear, drain, and grade the property and construct three one-story buildings. Two of the tenants for these buildings were tentatively identified as franchised restaurants; a future phase of the development called for a supermarket. A landscaped buffer area, to separate the businesses from the surrounding residential area, was planned. This proposed use was permitted under the B–3 classification.

Parranto's proposed development encountered vigorous opposition from neighboring property owners, particularly from residents of Windsor Green, a residential community adjacent to the site. Their expressed concerns included the potential for excessive noise, odors, light glare, traffic, and litter which would emanate from the site. Over 50% of the residents of the Windsor Green Association signed a petition, which was sent to the city council, requesting the property be rezoned residential.

Additionally, several hundred New Brighton citizens petitioned the Minnesota Environmental Quality Council (EQC) requesting an environmental impact study regarding the impact of the proposed development. In response, the EQC requested that an environmental assessment study be prepared.

In September 1975, the New Brighton Board of Review allowed Parranto's plat application to be passed on to the city council without recommendation. Shortly thereafter, the city council adopted a moratorium on the issuance of any of the permits Parranto would require to proceed with its development. The moratorium was to last until the environmental assessment was prepared and acted upon by the EQC, and the rezoning request from the Windsor Green Associates was resolved.

In November 1975, the New Brighton Planning Commission held a meeting to discuss the Windsor Green Association's proposed rezoning of the property. A staff report was given to the Board of Planning which recommended rezoning the property to either residential or a less intensive commercial use. The report was strictly limited to consideration of the physical planning characteristics of the site and the surrounding area, and discusses various zoning alternatives. The Board of Planning voted to defer action on the petition to rezone the property until their December meeting.

On November 14, 1975, the city notified Parranto that the Minnesota Department of Natural Resources (DNR) had designat-

ed the ponds on the property as public waters and that Parranto should apply to the DNR for a permit to fill the ponds.

On November 21, 1975, National Biocentrics, Inc., the firm selected by Parranto to prepare the environmental assessment, issued its draft report. The report acknowledged there would be several problems at the site. The city council reviewed this report and submitted corrections and comments. On December 9, National Biocentrics issued its final report. It again noted the possibility of problems at the site, but indicated there were ways to minimize or mitigate the problems.

The city council voted to receive the environmental assessment, and noted its receipt did not constitute approval or endorsement of the conclusions or recommendations of National Biocentrics. A copy was forwarded to the EQC. The city voted to postpone further action on Parranto's proposal until the DNR and EQC approved the proposal.[1]

On December 11, 1975, the Board of Planning recommended to the City Council that the property be rezoned to either residential or less intensive commercial (B-1, Limited Business).[2]

On January 13, 1976, the New Brighton Planning and Building Coordinator issued a report regarding Windsor Green Association's request to rezone the property to a residential classification. The report recommended rezoning the property to either a residential or limited business (B-1) classification. The city council immediately initiated proceedings to rezone the property to B-1, and moved to continue any further action on rezoning the property to a residential classification.

On that same date, the EQC determined an environmental impact statement was not required. Shortly thereafter, the Board of Planning recommended the property be rezoned residential.

At its next meeting, the city council held the first reading of ordinance No. 366, which would rezone the property from B-3, General Business, to B-1, Limited Business. This measure was adopted and published at the March 23, 1976 city council meeting.

Ordinance No. 366 contains the following reasons for the rezoning:

a.  That development of the land under a B-3 zoning classification would result in a development inconsistent and incompatible with the surrounding area.

b.  That the development of the land under a B-3 zoning classification would be difficult, if not impossible, from an economic and ecological standpoint.

c.  That development of the land with uses permitted under a B-3 zoning classification would result in excessive noise, odors, litter, light glare, traffic and ecological disturbance so as to be detrimental to surrounding lands and the City in general.

d.  That the land was originally zoned for residential purposes; in 1962 the land was part of a large tract of land which was then rezoned B-3; that since 1962, much of the B-3 tract was rezoned back to residential zoning; that since 1962 much development has taken place on lands adjacent to and near the subject property.

e.  That the City of New Brighton has more land zoned B-3 than is necessary to meet the needs of the community for the kinds of development permitted under this zoning classification.

f.  That a use less intensive than that permitted under a B-3 zoning is necessary to preserve and protect the public waters on the land and the flora and fauna dependent upon and utilizing such public waters.

g.  That the size, location, configuration, topography and water conditions on the subject land demonstrate that a B-3 zoning classification is not a proper zoning

---

1.  The DNR did not approve Parranto's original project until February 1979.

2.  The B-1 designation allowed the land to be used, among other things, for Government buildings and grounds, professional office buildings, parking lots, apartment hotel, and funeral home. It did not allow Parranto's proposed development.

classification; is contrary to good planning and does not best protect the health, safety, welfare, order and convenience of the City of New Brighton.

h. That the City of New Brighton in the exercise of its police power to protect the health, safety, welfare, order and convenience of the citizens of New Brighton, can reasonably and properly rezone the subject property to Limited Business, B–1, as such zoning does afford reasonable and economically feasible development possibilities for such land.

i. That the permitted uses of the subject land under a B–1 zoning classification would be consistent and compatible with the development of the surrounding area.

In April 1976, Parranto filed a notice of injury with the city.

Parranto brought suit in April, 1977, claiming the city's act of rezoning the subject property was arbitrary, capricious, and unreasonable, and amounted to an unconstitutional taking without due process of law. The complaint asked that the ordinance be declared invalid, or, alternatively, the property be declared condemned.

The trial was held in 1986.[3] The trial court made extensive findings of fact. It concluded the rezoning of the property was a valid exercise of the city's police power. It noted the court must defer to the city council's decision unless Parranto could show either the rezoning was without a rational basis or constituted a taking without compensation. It ruled Parranto had failed to prove all the reasons given for the rezoning decision were not legally sufficient and without a factual basis, and that Parranto had failed to prove the rezoning resulted in the elimination of all reasonable uses of the property.

Parranto then filed a motion for amended findings of fact, conclusions of law, or a new trial. It claimed Parranto had reasonably concluded there was no demand for the uses permitted under the B–1 designation at the time in the location. It also requested the trial court make findings of fact regarding the claimed amount of diminution of value as a result of the zoning, which it calculated as between $102,000 and $430,000. Parranto's expert testified at trial the value of the land prior to rezoning was $245,000, and after rezoning, the value was $143,000. The city's expert testified the value of the property was unchanged by the zoning, and remained approximately $235,000. Parranto also had another expert testify the value of the property zoned B–3 was over $500,000.

The trial court denied the motion for amended findings or a new trial. It reasoned, since the standard for a taking required Parranto show they had been deprived of all reasonable use, it did not need to make a finding regarding diminished value. The court noted the property was still "economically viable" after rezoning.

### ISSUES

1. Was the city's act of adopting this zoning ordinance a valid exercise of legislative power?

2. Did the rezoning of the subject property result in an uncompensated taking of property?

### ANALYSIS

■ When a government body adopts or amends a zoning ordinance it acts within its legislative capacity. *Sun Oil Co. v. Village of New Hope,* 300 Minn. 326, 333, 220 N.W.2d 256, 261 (1974). Such a decision must be upheld unless it can be shown the classification is not supported by any rational basis relating to promoting the public health, safety, or welfare, or that it amounts to a taking without just compensation. *State, by Rochester Association of Neighborhoods v. City of Rochester,* 268 N.W.2d 885, 888 (Minn.1978).

3. In 1979, Parranto proposed a medical office building for the site. The future tenants of the building conditioned their lease on the inclusion of a proposed restaurant on the ground floor. Parranto's proposal was denied because the restaurant was not a permitted use under the B–1 classification. Later in 1979, Parranto lost the property to the mortgagee. The property is currently developed under a multi-family residential zoning classification.

There are thus two separate inquiries we must make regarding whether a zoning decision will be upheld. First, we must determine whether it is a valid exercise of the governmental entity's legislative power —whether the zoning classification is rationally related to the public welfare. Second, even if the zoning classification is a valid exercise of legislative power, we must determine whether the rezoning amounted to an unconstitutional taking without just compensation.

## 1. *Validity of the ordinance as a legislative act.*

Parranto argues only that the action of the city council in rezoning the property constituted an uncompensated taking; it makes no claim the ordinance is invalid as a legislative act. In its brief, however, Parranto uses the scope and standard of review applicable to a determination of the *validity* of the council's action, not that applicable to whether a *constitutional taking* occurred. Thus, we will briefly address the validity of the council's action, and note the differing standards of review involved in each aspect of our inquiry.

### Scope and Standard of Review

■ On review of a trial court's determination regarding the validity of a zoning decision, this court must make an independent examination of the city council decision without according any special deference to the same review conducted by the trial court. *Honn v. City of Coon Rapids*, 313 N.W.2d 409, 415 (Minn.1981) (citing *Northwestern College v. City of Arden Hills*, 281 N.W.2d 865, 868 (Minn.1979)). The record for review includes both the evidence before the city council at the time of its decision as well as any new or additional evidence received at trial that is relevant to the issues raised and considered by the city council. *VanLandschoot v. City of Mendota Heights*, 336 N.W.2d 503, 509, n. 8 (Minn.1983).

■ To facilitate meaningful review, the legislative body must state its decision in writing in more than a conclusory fashion, though it need not make formal findings of fact. *Honn*, 313 N.W.2d at 416. This court must assess the legal sufficiency of the reasons given and determine whether they have a factual basis. *C.R. Investments v. Village of Shoreview*, 304 N.W.2d 320, 325 (Minn.1981). The test involves determining whether the reasons assigned by the city council do not have the slightest validity or bearing on the welfare of the area, or whether the reasons given by the council were legally sufficient and had a factual basis. *VanLandschoot*, 336 N.W. 2d at 508. This determination involves whether there was a rational basis upon which the city could have made the zoning decision. *Swanson v. City of Bloomington*, 421 N.W.2d 307, 311 (Minn.1988), *Honn*, 313 N.W.2d at 415.

The challenger bears the burden of showing that the stated reasons are either without factual support in the record or are legally insufficient. *Hubbard Broadcasting, Inc. v. City of Afton*, 323 N.W.2d 757, 767 (Minn.1982). It is not necessary that all the stated reasons be legally sufficient and factually supported. *Id.* at 765, n. 4.

The test, then, is whether the reasons given by the city council are legally sufficient and supported by facts in the record. Parranto does not argue the reasons given by the council were legally insufficient, only that they were not supported by the facts. Therefore, we will review only the question of whether the reasons given by the city council were supported by the facts in the record.

■ The reasons given by the city council in support of the rezoning can be broken down into several categories.

### A. Consistency and compatibility with the surrounding area.

Reasons "a", "c", "d" and "g" all relate to the proposed development's compatibility with the surrounding area. Parranto claims the facts do not support the conclusion that the surrounding area was primarily residential and that a B–3 development would therefore be inconsistent with the area.

There is clearly a rational basis for the city to conclude the area was primarily

residential. The maps of the area indicate, upon even a cursory glance, that the area is primarily residential.

There is also a rational basis for finding the B–3 development would be inconsistent with the surrounding area; two restaurants and a supermarket (with the attendant increased odors, trash, traffic, and noise) could rationally be found to be inconsistent with the predominant residential use. The fact the environmental assessment acknowledges potential problems with increased litter, noise, and odor supports the council's findings.

### B. Economics and market conditions of the city.

Parranto next takes issue with findings "b", "e" and "h", all of which broadly relate to economics and market conditions of the city. Parranto argues the record does not support these findings because the city did not conduct a study of the economic feasibility of a B–3 development. The city did, however, discuss the Comprehensive Zoning Plan, which indicates there was an excess of property zoned B–3. The city council also discussed the fact that several area businesses had been forced to close.

The city could rationally have concluded there was an excess of B–3 property in the area. The city need not conduct a study in order to meet this minimal burden; it may rely on its general knowledge of the area. In a relatively small community, city officials have the experience, competence, and capacity to measure the impact of zoning decisions on the community without relying on expert witnesses to determine whether or not the use is in harmony with the general purpose and intent of the city plan. *White Bear Docking v. City of White Bear Lake*, 324 N.W.2d 174, 177 (Minn.1982).

### C. Ecological concerns.

Parranto also disagrees that the city's ecological concerns, expressed in findings "b", "c", "f", "g" and "i", are supported by facts in the record.

The environmental assessment done on the property indicates "development in the proposed manner will severely degrade and destroy animal habitat and living environment, along with individual animals." The same report indicates the development created a potential for degradation of Silver Lake. Thus, the finding of potential harm to the environment has a rational basis in the record.

### 2. *Constitutional argument.*

The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." The Minnesota Constitution, Article I, § 13 provides that "private property shall not be taken, destroyed or damaged * * * without compensation."

### Standard of Review

The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests or denies an owner economically viable use of the land. *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Nollan v. California Coastal Commission*, 483 U.S. ——, ——, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987). The *Agins* court went on to note that "[a]lthough no precise rule determines when property has been taken, the question necessarily involves a weighing of private and public interests." *Agins*, 447 U.S. at 260–61, 100 S.Ct. at 2141 (citation omitted).

The United States Supreme Court has recently analyzed the question of whether a taking has occurred by considering several nonexclusive factors. Rather than using a rigid analytical framework, the court has:

relied instead on ad hoc, factual inquiries into the circumstances of each particular case. To aid in this determination, however, we have identified three factors which have "particular significance:" (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations";

and (3) "the character of the governmental action."

*Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986); *accord, Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, ——, 107 S.Ct. 1232, 1242–48, 94 L.Ed.2d 472 (1987) (conducting similar analysis).

While both the *Agins* test and the 3–part *Connolly* test were applied by the Supreme Court last term [4], it is unclear which circumstances dictate the use of one test or the other. Under either analysis, however, Parranto has not established an uncompensated taking.

#### A. *Agins* analysis.

1. Does the zoning decision substantially advance a legitimate state interest?

■ The United States Supreme Court has indicated a broad range of governmental purposes and regulations (including scenic zoning, landmark preservation, and residential zoning) may satisfy this requirement, *Nollan*, 483 U.S. at ——, 107 S.Ct. at 3141. Minnesota has identified the protection of a broad category of natural resources as being a legitimate government interest. *State, by Powderly v. Erickson*, 285 N.W.2d 84, 87–88 (Minn.1979).

The City has identified three interests it argues are substantially advanced by the rezoning of the subject property: preservation and guidance of family oriented neighborhoods (including protection of the populace from excessive noise, litter, and glare); control and prevention of economic blight in days of extensive redevelopment activities; and preservation of ecological resources.

Given the broad notion of a legitimate state interest, we agree that all three of the stated interests are legitimate. We must determine whether any of the stated interests were substantially advanced by the rezoning.

*Protection of residential neighborhoods.*

This interest is substantially advanced by the rezoning. Allowing a less intensive use allows a buffer zone between single-family residential neighborhoods and traffic on Silver Lake Road, while minimizing the disruption to the neighborhood.

*Control of economic blight.*

The record indicates the city council was concerned with empty commercial buildings in the area. The city's act of rezoning this property substantially addresses this concern.

*Preservation of ecological resources.*

The environmental assessment indicated the proposed development would produce a negative impact on the flora and fauna of the tract. We cannot determine, from the record before us, whether this interest was substantially advanced; it is unclear what impact the act of rezoning the property had on protecting animal and plant life. There is no requirement, however, that all of the city's stated interests be substantially advanced by its zoning decision. The other stated interests were substantially advanced.

2. Has Parranto been denied economically viable use of his land?

The trial court made a finding that the land was economically viable. In a claimed taking, the trial court's findings of fact will be upheld unless clearly erroneous and unsupported by the record. *Czech v. City of Blaine*, 312 Minn. 535, 253 N.W.2d 272, 274–75 (1977). Parranto's own expert testified that the property continued to have considerable worth; this testimony supports the trial court's finding of economic viability.

#### B. Three pronged analysis of *Connolly.*

1. *Economic impact of regulation on claimant.*

■ While the trial court did not make findings of fact regarding the economic impact on Parranto, the trial court found the property remained economically viable. The property, according to Parranto's appraiser, was worth substantially more than its purchase price. While there may have

---

**4.** *See Nollan* (applying *Agins* ) and *Keystone Bituminous Coal* (applying *Connolly* ).

been some economic impact on Parranto, the fact that the property remained economically viable after the rezoning weighs against finding a taking in this case.

Additionally, Minnesota has repeatedly upheld land use restrictions against allegations of unconstitutional taking, even where the value of the property has declined significantly as a result of the restrictions. *See McShane v. City of Faribault,* 292 N.W.2d 253, 257 (Minn.1980). Even if the value of the subject property has declined, such a determination is not dispositive of Parranto's takings claim. We must look at the economic impact with regard to the other factors outlined by the Supreme Court.

*2. The extent to which the regulation has interfered with distinct investment-backed expectations.*

In *Connolly,* the Supreme Court denied a claim of unconstitutional taking based on governmental regulation which forced additional contributions to employee pension funds. In analyzing the "investment-backed expectations" aspect of the case, the court noted that extensive governmental regulations in the pension field operated to diminish claimed investment expectations.

Similarly, in this case, Parranto purchased this property knowing extensive restrictions might be placed on land use, and knowing the city was in the process of implementing its comprehensive land use ordinance. Prior to submission of its plan for development of this property, Parranto was also aware the city viewed the B–3 designation of the property as inappropriate. The extensive governmental regulations in this field, along with the city council's actions prior to Parranto's submission of the proposed plat, operated to diminish Parranto's claimed invesment-backed expectations.

*3. Character of the governmental action.*

The Minnesota Supreme Court has adopted differing standards for a showing

of a constitutional taking dependent on the nature of the governmental action. In *McShane,* the court ruled that the rezoning of appellant's land, which took place to accommodate a municipal airport's flight pattern, constituted a taking. The court adopted the approach to this question advocated in Sax, *Takings and the Police Power,* 74 Yale L.Rev. 36 (1964). In Sax's view, the critical distinction is the difference between the function the government is performing in rezoning the property. If the ordinance involved is designed to effect a comprehensive plan, there is no taking unless the owner has been denied "all reasonable uses of the property".[5] *McShane,* 292 N.W.2d at 257, n. 2, citing *Holaway v. City of Pipestone,* 269 N.W.2d 28 (Minn. 1978). In this type of a case, the government is acting in an "arbitration" function, and the standard reflects the "increasing complexity of society and the realization that property must be viewed more interdependently." *Id.* citing *County of Pine v. State, Department of Natural Resources,* 280 N.W.2d 625, 630 (Minn.1979).

In this case, the city council was clearly acting in an arbitration capacity. The finding that the property was economically viable indicates Parranto had not been denied all reasonable uses of the property. In conjunction with Parranto's limited investment-backed expectations and the continued economic viability of the property, the nature of the government action weighs against the conclusion that the rezoning constituted a taking of Parranto's property.

### DECISION

The zoning decision of the city council was a valid exercise of its legislative power. Under the circumstances, it did not effect a taking of appellant's property.

Affirmed.

---

5. In contrast, the *McShane* court indicated that where the government "interfere[s] with the use and practical enjoyment of property by physical governmental activity," a compensable taking has occurred where the activity "causes a definite and measurable decrease in the value of [the] pioperty." *Id.,* 292 N.W.2d at 257.